Sadeghian. I may be mispronouncing that. If I am, I apologize. Mr. Reed. I'd be pleased to hear from you, Mr. Reed. May it please the Court. My name is Terrence Reed, and I am here on behalf of the Virginia Limited Liability Company, named U.S. Smoke and Fire Curtain, urging this Court to reverse the summary judgment of the District Court upon its verified derivative complaint, which was brought against its CEO, Chief Executive Officer Steven Sadeghian, which I think is how it's pronounced, and his two wholly-owned companies, CISA, C-O-I-S-A, and U.S. Smoke and Fire Services, for short. The complaint is basically that Mr. Sadeghian diverted to himself and his two wholly-owned companies. That's not a procedural reference. You say you're here on behalf of U.S. Curtain, which has been dissolved. Is that right? Not to my knowledge. Part of it is the dissolution is being considered for it? Oh, no. There was an application, a summary judgment motion below seeking its dissolution, which the District Court denied. You are representing U.S. Curtain in the capacity, but not OSS, or Mr. Curtis? I represent the derivative plaintiff under the Virginia Derivative Statute law, which is, I guess technically, it's the plaintiff is the member bringing the claim on behalf of the entity. And that is?  Curtain is the member. No, I'm sorry. OSS is one of two members. OSS is the member. That's the shareholder bringing the shareholder derivative suit. Now, what about the individual, Mr. Crist? Mr. Crist is the president of Curt. Is he a shareholder? No. He is not a derivative shareholder? No. And Curtain is the derivative shareholder?  Curtain is the company. Curtain is the company. And it has two members. OSS is the derivative shareholder. Derivative plaintiff, that's right, on behalf of Curtain, correct. And just for clarity's sake, while this sounds like a shareholder derivative suit, Well, it does, and you all can't agree who the proper plaintiffs are, and we understand that, too. He thinks he's representing Curtain, and you think you're representing Curtain, and we're going to figure it out here. Okay. But your position is that you're representing OSS on behalf of Curtain. That's correct. But there's a principle behind this, an individual, a breathing person, I think, named Crist. And on the other side of it, the other fellow that the fight's about, or with, is Sudeikin. Those two individuals are the ones that can't agree, and we've got these corporate entities or whatever, the LLCs, that are the instruments of their personal business dispute. That is correct, Your Honor. Which is a garden variety dispute under Virginia law. That is correct, Your Honor. Which is complicated by all these names and stuff you throw around. And it's all about who's going to sell fire curtains and who's going to sell smoke curtains at the port from England or somewhere. That is correct, Your Honor. And the issue here is, it's our position that the company, U.S. Smoke and Fire Curtain... The company. There's all kinds of companies here. Well, the company that was doing the business, which is U.S. Smoke and Fire Curtain, has both an opportunity and a contractual right to engage in the sale of smoke and fire curtains. And that that opportunity was usurped by its CEO, Mr. Sudeikin. And you base that on what they call the, what, the Curtain Operating Agreement? That is a principal ground, yes, Your Honor. And that operating agreement... Which refers to both smoke and fire curtains. As within the business purpose of curtains. But the judge... Hilton. Hilton wrote the smoke part of that out of it. That is correct, Your Honor. And he did that based, not on the language of the contract, which was an integrated contract, and therefore should have been enforced. Therefore, it embodied the intent of the parties. And that is where any disclosure or tender of an opportunity should have been made. Because all the parties are... And that gets into what you say is a contravention of the parole evidence rule. That's correct. How do we get jurisdiction over any of this stuff? Well, the court has jurisdiction over the, because under the federal question statute, there are trademark issues that are associated with this, including trademark issues that have been decided in the district court on summary judgment. That were brought in the complaint, the verified complaint. And we... Trademark issues seem to be way out there to the side somewhere. I mean, this... Well, actually, Your Honor, while that may appear... It's a jurisdictional hook that you're trying to use to get in here. The trademark issues for us to have jurisdiction have to be substantial and related. And they are substantial because they're fighting over the rights and the names. Did the judge ever rule they were substantial and related? No. He did not assess the jurisdictional question? No, he did not. Whether supplemental jurisdiction applied to any of this stuff? No. Although we... To the state law claims. One of the reasons why they are related, Your Honor, with all due respect, is that... Well, can we just decide that on our own up here if the judge didn't decide it? Whether the supplemental jurisdiction should be exercised? That should... If they're substantial and related, then the district court has to exercise its discretion to make a determination of that? Well, I'm not in a position to tell the court what it can or cannot do. I'm here to say that that has not been done. It is a prudential consideration for appellate courts to ask the district court to rule in the first instance, since it is a court of the first instance. And that was not done here. Well, it's not prudential if it goes to the very part of whether we have subject matter jurisdiction to begin with, or whether the district court did. Well, that is true. But the issue of whether there is a federal claim... The district court here clearly concluded there were federal claims because he ruled. Well, there is a federal claim. There's a trademark claim. Right. But it's sort of down the road. It's not even in the first count, is it? I mean, you start off talking about this shareholder derivative claim of Mr. Sudeikin siphoning off the smoke business. Right. And he also siphoned off or attempted to siphon off the trademarks. And that is one of the corporate opportunities we claim as being usurped here. Not only the website, but the name and the registered trademark elevator shield. Counts five through six of the counterclaims clearly allege that the elevator shield, a registered trademark of Curtin, was being used by them and asked the court to invalidate it on their behalf, which is a mirror image of our claim that they are infringing. Let's just use the term corporate opportunity, for which we will have to make some decision as to what the state of the law is in Virginia on. And from my reading of it, at least what it appears is there's really no clear indication that Virginia recognizes it to the extent that perhaps you would like. Would we have to go and maybe develop this law to some extent, or at least interpret Virginia law to provide for such a thing? Actually not. Today Holmes' opinion from the Virginia Supreme Court is very clear, and it's right in the mainstream of corporate opportunity doctrine. And it says that any officer of a company has an obligation to disclose and tender to the company any opportunity. And it defines opportunities as anything that the officer wants to take advantage of. And that's the standard in Virginia, which is, quite frankly, broader than most. Does that apply to third parties? To a third party? Well, the third party issue, which was actually addressed in the Today Holmes case, is not really the issue. The question is the officer, whether the officer's fiduciary duties to his company. He can't basically go to a third party and say, leave me, I'm not an officer. This is Mr. Stegian you're talking about. That's right. And what was his position with the company? I assume you're talking about Curtin again. Yes, he was the chief executive officer. He was one of the promoters. And what was Mr. Crist in that company? He was the president and also one of the promoters. They put this company together. You've got a CEO that's on the other side of your case, and your man's the president. Who runs the company? Well, they both do. They both have defined management responsibilities in the operating agreement. For example, Mr. Crist. Well, who runs it? Which one's the top gun? The chief executive officer, for sure. And that is? Mr. Stegian. But he, like all other corporate producers, is not free to use the corporation or opportunities of the corporation for his own self gain. The third party I wanted to mention, Bradley Limited, is in there. There's some, at least if we were to take the proven evidence, or at least the information that was provided, is that Bradley Limited wasn't going to allow your company to do this anyway, which would be, in essence, the deprivation of a corporate opportunity. My question goes to, does Virginia recognize such a thing against a third party? Surely against the party that's directly involved, but not against a third party, Bradley Limited. So does this, is the law clear that Bradley would be included within Virginia law? Yes. And I can again bring the report back to the Today Home's opinion. The Today Home's opinion from the Virginia Supreme Court was one where there was a corporate officer in a land development company who then, while an officer goes out and creates a new co, and with that new co goes to a third party to buy land and then develops it. The issue was, did that violate his fiduciary duties and was that a usurpation of corporate opportunity to go with a third party as to which his principal, the corporation, had no contract? And the Virginia Supreme Court said yes. And the theory there is his duties run to the corporation and those duties are two in number, disclosure and tender. Neither happened in that case, neither happened here. I see my time is limited. Your time's up. I mean, you got a red light on there. You had some time reserved. I will reserve it. Very good. Thank you. Mr. Hicks? Good morning, Your Honors. May it please the Court, my name is Tom Hicks, C. Thomas Hicks III, and I represent Stuart Crist and the Office of Strategic Services, Inc., OSS. And there is understandably some confusion as to who the parties are in this case. I came into the case, frankly, because these two parties were brought into the case by a counterclaim filed by the defendants against the plaintiffs in the form of a counterclaim against my clients who were not plaintiffs and were not parties to the suit. How does your position differ from that of U.S. Curtin? U.S. Curtin... In terms of your legal arguments before us today. Well, my position relates... I don't really differ... I don't really disagree with U.S. Curtin's position, which would be espoused by Mr. Reed. However, I'm not arguing U.S. Curtin's position. I'm here today to argue in favor of these two individual parties that could have been... But OSS was the original plaintiff. But, again, that's where the confusion is. OSS was the nominal plaintiff under the LLC statute. But it is the name... The name plaintiff, but substantively. As the plaintiff, it's the shareholder that ostensibly brings the suit on behalf of the corporate entity. Yes, Your Honor, it's the nominal minority member or shareholder, the same as the corporate entity. What nominal is when you file a derivative suit against... Well, you're filing the suit on behalf of the company in this case. And that's what a derivative action is, as you know. It's the company who is the plaintiff. And the party, the nominal party, the minority member, who, by statute, has the right to file the suit when those who control the company fail to bring action, is nothing but a nominal part of the suit. So they nominated their complaints against U.S. counterclaims. Rather than answer the complaint and bring counterclaims against the plaintiff, Curtin, they brought counterclaims against two parties who were not plaintiffs. Well, you're saying they're not proper counterclaims. They're not proper counterclaims. They tried to bring counterclaims. Well, and they effectively did. And the judge ruled that they could. And the judge ruled they could, yes, Your Honor. We believe we should not have been brought into the case. If they wanted to bring these claims, it should have been through a separate action. But that's not the tact that was taken. Do you have any position on whether there's any jurisdiction here in federal court for this corporate case? Beyond the trademark claim. I believe that the trademark claims, which are substantial claims, are the basis for jurisdiction. Yes, Your Honor. You think they're a good basis? Yes, sir. You think the judge had to rule they were a good basis? I don't know that the judge had to rule. The fact that the judge didn't rule obviously begs the question. Nobody raised jurisdiction in the district court. No one raised jurisdiction. Everybody wanted the federal court to decide this. The judge did not abuse his discretion in his ruling because he didn't rule. You have to exercise your discretion or purport to exercise the discretion in order to not abuse it? I believe you'd have to purport to exercise it in order. Did he purport to exercise it? I don't believe so. Well, first you have to purport to understand it, the scope of your discretion. It doesn't appear that this issue was ever raised with the district judge. He got to the merits and, frankly, at the end got so exhausted that he threw just about everything in. Well, I can't speak to the judge's frame of mind, but the defendant decided not to raise jurisdiction as an issue, which implies consent and waiver of jurisdiction. Well, subject matter jurisdiction is never waived, so I can't waive it. And you alleged jurisdiction. You didn't. Curtin alleged jurisdiction under 1331, which is federal question jurisdiction. Yes, Your Honor. And the only federal question here is the so-called trademark claim. Yes, Your Honor. In the second count, I think. Maybe not. Well, in the original, in the case in chief as well as in the counterclaim. But our problem in our position, I think it's important that if I do nothing else, I make the point effectively that there are separate entities here, and my two clients hired counsel, hired me, because they were brought in wrongly, we think, brought into this case with these counterclaims, and they had the right but also an obligation under Rule 13 to file compulsory, some compulsory counterclaims themselves, which were proper because, and they didn't require leave of the court under Rule 15 because they were not parties to the, they could not have anticipated or imagined that they would become parties to this case and could not have imagined when the case was filed what counterclaim, that counterclaims would be filed against them individually, so they could not have participated in filing their, my client's counterclaims in the beginning of the case. The first time they had an opportunity to even file anything was after the defendant's counterclaims were filed against my client. Didn't the court judge characterize those counterclaims as really just amendments to the derivative? That's what the judge has characterized it. We don't see how it can be an amendment to claims that our clients had never filed in the first place and could not have possibly, I mean, they would have had to have clairvoyance and jumped into the case somehow to file those claims in the first place, and they were separate claims. These were direct claims that were filed by our clients against the defendant. Well, that's the question. Either they were direct claims or they were properly, they should have been properly styled from the beginning as part of the original derivative complaint. If our clients had been plaintiffs in the case in the first place. Well, they didn't need to be plaintiffs if they were part of the derivative complaint. But our clients were not parties in the first place. Our clients... OSS was a party. OSS was a nominal plaintiff. We would contend that substantively OSS... OSS was not a party originally. OSS did not have any substantive role. It was just carrying out the right of the members of this... It was there in a representative capacity. In a representative capacity. OSS had a 49% interest in U.S. Courts. Yes, Your Honor. That, in your opinion, is irrelevant in terms of... It's what gave OSS the right and the duty, in effect, to file the representative suit on behalf of Curtin under the statute because no one else was going to file it. The majority, CYSA, was not going to file that suit against Curtin and it had to be done representatively under the derivative statute. Do you want us to... You'd like for us to reverse all the rulings that the Court made with respect to Crisp and OSS? To reverse the rulings that the Court made with respect to the dismissal... To reverse the ruling with respect to our claims, OSS and Stewart Crisp claims, against Sedagian and the other two defendants. Are those the counter-counterclaims? Those are the counter-counterclaims, which we feel were proper. They were direct claims that could not have been made earlier. Is there anything else you want us to do? That's all I would like this morning, Your Honor. Okay. Thank you very much. Thank you. Mr. Lucchini? I mispronounced your name as well. No, sir, you got it just right, Lucchini. Thank you. I'd say it's a good Irish name, but it's not. Good morning, Your Honors. May it please the Court, my name is Joseph Lucchini. I represent the three original defendants in the case who are Dr. Steven Sedagian, U.S. Smoke and Fire Services, LLC, and SISA Development Corporation. Just to clear up one thing, with regard to this derivative suit, the nominal party is the company. So when OSS brings the case, it's OSS. That's the party plaintiff. So you say that's the nominal party, you say is Curtin. The nominal party is Curtin. That's the Curtin Company. It's sort of standing to the side, if you will, letting this member, in this case, pursue this claim, and to the extent there's success, the member doesn't get the result. The money goes to this company. Didn't I just hear the nominal party is OSS? No, sir, I think the nominal party is the Curtin Company. The nominal party is the Curtin Company. You all disagree on that? We disagree on a lot, I guess, at the other side. You all disagree on everything. What about jurisdiction, though? You seem to agree on jurisdiction. Well, sir, yes, sir. The federal court has got to decide this thing, that you don't have to go to state court on it. I appreciate that question. That was never raised as a defense. Yes, sir. That was never raised as a defense by the party's defense. That was not an affirmative defense. That was not raised before the court. And when we got into the trademark issues, in fact, they waxed and waned in terms of importance, I'll concede, to the court. I mean, there were times when they seemed to be very, very significant because what was being claimed by them is that Sedigian, who really did own the copyright on the website, the assertion was that he had taken this copyrighted website and used it with regard to the services company, and that was a violation of the trademark laws. Well, what Judge Hilton found, which, of course, was our position, was CISA owned the website, so there was no violation of any trademark laws. So that was a very significant issue. And it was certainly from our perspective, and we defended it vigorously and won on that issue. So I do think the trademark issues were significant and substantial enough that there was jurisdiction at the district court. The issue was not raised, and I think in recognition of the substantial nature of the issue when the case started and has progressed, it was not raised by other parties. It was not ruled on by the court. Jurisdiction issue? Excuse me? Jurisdiction issue wasn't raised? Yes, sir. Not in terms of... You can't give yourself jurisdiction. No, you can't. I agree we can't give ourselves jurisdiction. Certainly not. That's not the kind of jurisdiction we're talking about, right? Excuse me, sir? The subject matter jurisdiction. Subject matter jurisdiction based on federal question. The trademark laws. What's the business about raising it? Excuse me? What does raising it have to do with subject matter jurisdiction? Well, it was not raised as an affirmative defense by the defendants that there was no subject matter jurisdiction of the court. We did not raise it. The question I'm asking is, even if we don't raise it, are we going to acquire subject matter jurisdiction because you didn't raise it? No, sir. I think you obviously by your questions are concerned about that issue and are looking at that issue, and I think it's certainly within your realm to do that. The question that was asked to me was, did I believe that there was substantial enough federal question jurisdiction for this court to assume jurisdiction in this case? And I'm saying, yes, there was. From our perspective, defending these trademark claims, which were in our view very significant when this case started, so significant we did not raise that as an affirmative defense that there was no subject matter jurisdiction. I haven't looked. I don't have your answer right in front of me. You probably admitted the allegation of jurisdiction. Yes, sir. I think we did. We did. That doesn't mean there is jurisdiction. No, sir. I agree. We can't confer it upon the court. I know. And it's a question of, I think, supplemental jurisdiction. It's whether a district court or federal court is in a position to exercise supplemental jurisdiction. The federal question is the trademark, and there's other stuff that you all are arguing about, about who's going to sell Smoke Curtain, whether your client rifled off the business of Smoke Curtain, is a state law issue. Yes, sir. I think those are state law issues. There's certainly no diversity between the parties. Everything else is a state law issue. For example, this parole evidence rule that comes up here is a state law rule. We're talking about the Virginia version of the parole evidence rule. Whether that was properly considered here, because the judge took into account all the discovery and then wrote the word smoke and, those two words at least, out of the distribution agreement. In fact, no, sir, he did not. And you've got to come up here and convince us that he properly did that. No, sir, he did not. He didn't do that. No, sir. The distribution agreement says smoke and fire. There's three agreements we're talking about. There's the Curtain Operating Agreement. That's the one that has the word smoke and in it. And that's the one that your client and OSS are parties to. We are parties to that agreement. Now, a month and a half before that operating agreement was entered into, the definitive agreement and the agreement that Judge Hilton looked at, which in our view was the proper agreement to look at, was the distribution agreement. And your client's not a party to that. The two parties to that agreement are the Curtain Company and BLE. And who? BLE. And which one do you represent? Which one do you represent? I don't represent either of those parties. I represent the individual who signed the agreement. Your client's not a party to that. Which says that Curtain is going to be, and the purpose of it is marketing, selling, and distributing smoke and fire curtains in the United States. But in order to – That's what your client agreed to in writing in the Curtain Operating Agreement. And in this case, you have to say that the smoke and those two words are surpluses. They were never intended to be in there. Well, I think it was obvious from all the – And you convinced the district judge that he could decide that as a factual matter on a summary judgment proceeding based on the discovery. No, sir, I didn't. You didn't? No, sir, I didn't. What I convinced the judge – Well, if smoke and are properly in there, then Curtain is in the business of marketing and selling smoke curtains. Only if it has – And your man, today again, is the president of it, or whatever, the CEO or something? He was the CEO, yes, sir. Right, CEO. Only, sir, if – And this is the law that we cited, and it's from Fletcher's, which in fact is the very section that we cited, 861.10, has been cited with approval by this court, not within this particular issue, but by this court. But also Fletcher's is well recognized in Virginia Supreme Court cases as well. What Fletcher says is it can't be just a corporate opportunity, but the company has to have the capacity to do it. And that's what Judge Hilton focused on, because six weeks before this operating agreement was entered into, BLE and the Curtain Company entered into the distribution agreement, and pursuant to the distribution agreement, that's the only way that the Curtain Company could get BLE products. And the Curtain Company – in terms of its definition of products and the like, and this just screams out for a factual determination by a jury. Well, there are several rules we think which apply to the distribution agreement and which Judge Hilton looked at in that regard. First of all, you can't interpret an agreement such as to create surpluses or contradictory determinations. And that's the way the other side would have the court look at it. They would say products means everything. You have exclusive right for everything, smoke and fire curtains, under the distribution agreement. Yet the agreement then goes on to say that your exclusive only applies to fire doors, fire shutters, fire curtains, and that you have not – I'm sorry, fire doors, fire shutters. You have non-exclusive for every other fire curtain. So there's a contradiction in their interpretation and the way they want the court to look at the agreement. They've created that conflict. They've also created surplusage because if the agreement, by the term products, their interpretation, gave exclusive rights to all products, then why does the agreement then say you have exclusive right to fire doors and fire shutters? That creates a surplusage. Our view does not, and our interpretation agreement does not, where it says products, you have exclusive right to these products and that which the company gives you in writing, the authority to import. So you've got this, Sadegan, who's the CEO of U.S. Curtain, and then there is the Bradley Corporation, which we can probably say is a fact, has said through a distribution agreement, we will not sell to U.S. Curtain. But is there not an obligation on the part of Sadegan to disclose that to U.S. Curtain? We did. You did? He did. He did. When and how did that disclosure take place? He disclosed it to them in so many ways, starting when they were putting together this website. This website was done by CISA in March of 2009. Now, according to Mr. Christ, he's the one that actually dealt with the website company. And within the website itself and the contract itself, it says that BLE, that CISA is willing to be importing smoke curtains for CISA. Isn't there a factual dispute about all of that?  I mean, doesn't the other side present evidence to the contrary? Well, let me go on. Well, I mean, that's important because we're here on summary judgment. Yes, sir, I'm here on summary judgment. There's no dispute about what that agreement says. You have evidence to support your position, but if there's evidence on the other side, that would mean that summary judgment is not proper. Well, the question you asked me, sir, was, was it disclosed? The question I ask you is there not a dispute as to what you've just said, that you've disclosed this evidence in a factual fashion? No, sir, I don't. Other than them saying it, when you look at all the factual. . . Are they saying it in the form of an affidavit or in the form of just seeing it in argument? Are they saying it? In other words, is it evidence as to what they are saying? Well, I think there . . . I don't think there is, Your Honor. I mean, what we have shown is communications by Christ himself acknowledging that CISA and services are going to be doing smoke curtain work. Christ has said this, and this is in our pleadings. We have this. . . But is there a statement that Bradley will not allow U.S. Curtain to sell the smoke curtains? Isn't that what we're talking about? Aren't we talking about the Bradley company? The opportunity doesn't exist because this third party will not allow you to do it? Well, it is, yes. That's the disclosure I'm talking about. Was that disclosed to U.S. Curtain? You've got this distribution agreement, and only you know about. . . How does it become knowledge of U.S. Curtain that Sedighen is the COO of? Well, it becomes knowledge because they get the website where it said it, and Christ said he was in that. And that's disclosure to U.S. Curtain within this website? At that point, the company didn't exist,  When you say company, you're talking about Curtain? The Curtain company did not exist until July 7 of 2009. And so then you create this company that has a separate agreement, sort of has it in there. Is there a disclosure then? Yes, and this is at Joint Appendix 1141. This is Christ writing to the insurance carrier, telling them that the Sisa Company will be doing smoke curtains in 2010. That's Christ admitting he knows that the Sisa Company is going to be doing smoke curtains in 2010. This is now 2009. In August 5 of 2009, you've got Sedighen wrote to Christ and was looking for help in creating the letterhead for the services company, which is going to be doing the smoke curtain work. Christ sends him the Curtain letterhead, so he can use that to create his letterhead for the services company. Christ knows all about it. So if Christ has testimony in the record in the form of an affidavit that says something different than what you say, you have to admit there's an issue of fact. Well, no, sir, I don't. Well, not where it's Christ saying in writing something which may contradict his oral statement now. Isn't he just saying there that the company has the right to sell those products, but where does it say that it's an exclusive right? I'm sorry? Where does it indicate that that limitation is intended to be exclusive, what you just read? Well, I go on. Because on August 11 of 2009, Christ is told by Sedighen, quote, I made a separate company to go around the USA and install draft curtains, that's these smoke curtains. No dealer is to do this. That's exclusive. It's mine. And he says that. Who said that to who? Sedighen says this to Christ. That's what I thought. That's Sedighen. Right? And this is Joint Appendix 1148. That's after the operating agreement. No, sir, it's before the operating agreement. Well, I thought you said the operating agreement was in July. No, the operating agreement was on August 28. The distribution agreement is July 13. Aren't there some disputes about the dates as well? No, sir, there's no dispute about the operating agreement date, which is August 28, and the distribution agreement for the curtain company, which is July 13. There's no dispute about that whatsoever. There's no dispute about these documents either. So if there's a subsequent statement after that statement in which Chris says that there was a mutual agreement for us to get into the business of distributing smoke curtains, wouldn't that be contradictory? I mean, that is within even accepting where you are in terms of what happens before this, if after there is a representation that's made that we are going to agree to have this distribution with U.S. Curtain, would that not create an issue of fact? No, sir, it still comes back to the issue of capacity, and that is the capacity of the curtain company to import these BLE curtains, smoke curtains. And under the distribution agreement, it does not have that capacity. Because Bradley will not do it. It won't do it. And that's the disclosure that I'm asking. Where is it said to Chris, Bradley won't do it? Again, on August? Not that his company has the right to do it or can do it, but that Bradley won't do it. Well, first of all, it's in the affidavit signed by Millington, paragraphs 14, Millington's affidavit, paragraphs 14 through 17 and 20. Isn't this parole evidence? That's not parole evidence. This was part of the contract. This is, this is, you asked me. No, I want to ask about what you, Millington, when you're getting this other additional evidence, isn't that parole evidence? And doesn't, does not both of those contracts have very strong merger clauses in them? They both have merger clauses. How do you bring in all this extra evidence? Well, first of all, the evidence that was brought in was both before and after the distribution agreement. Because that's what, and we're talking about performance of a. Are you telling me it's incorporated in the contract? Well, I'm trying to deal with this merger business, because it looks like merger clauses mean what they mean, incorporate what's there. And now you're telling me that there are statements from others here, Millington and others, and that's here, that's evidence, looks like parole evidence to me. And Virginia has some pretty strong laws on that. And I'm trying to determine how do you use that in the face of merger clauses? Well, also the law of Virginia is that this is a sales contract, a distribution agreement is a sales contract, and the parole evidence rule does not apply. Oh. Does not apply. So you can bring in parole evidence. You can show in terms of showing how the parties interpreted the contract and how they performed in accordance with the contract. Yes, sir. So the merger clause is meaningless. Why not? The merger clause is meaningless. There's no contradiction here between what is contained in the distribution agreement that that curtain had with BLE and the actual performance of the parties. Except that that additional evidence says Bradley won't sell to you, and that's not in the contract. That sounds like to me that's not true. Yes, sir. It says you can only sell that which I give you a right to sell in writing. And the only thing I give you a right to sell in writing is fire curtains, fire shutters, and other fire products, period. That's what the distribution agreement says. It doesn't give them a right to anything else. It says if you want to get anything else, you have to get an agreement from me in writing. And Curtin Company, OSS, Christ, never sought that from BLE. BLE the only manufacturer in the world that makes these things? No, sir, it's not. But the agreement between these parties was only BLE products. Go get a supplier smoke curtain from somewhere else. That wasn't the agreement between the parties. According to the operating agreement. That wasn't the business between the parties in the operating agreement. It's only to sell BLE products only. That part we do agree with. I'm way over my time, Your Honor. All right. We've been asking you. Okay. Judge Wynn may have some more questions. No, I did want to know about that disclosure one more time. You said it was disclosed when? That BLE would not sell was disclosed by Sedegan to Chris when? It's disclosed in July of 2009 when you had the head and Sedegan, excuse me, OSS and Chris acknowledged having the distribution agreement because they say they got it. In fact, Chris says he participated in the preparing it. And in that distribution agreement it says only. We will sell you only fire curtains, fire shutters, and for that you have an exclusive right. Thank you. I've got a follow-up. If it is proper to consider this parole evidence to impeach the contents of the operating agreement or to correct the contents of the operating agreement, doesn't that in and of itself justify a jury trial? No, sir, it doesn't because I don't think the other one. Parole evidence can be used to create, if it's admissible, isn't it the fact that it can only be used to create a question of fact? The issue here on which Judge Hilton ruled, he didn't even mention the operating agreement in his opinion. And the reason is it was not relevant to the issue of whether the company, Curtin, had the capacity to import and sell smoke curtains. Since it did not have the capacity to import and sell smoke curtains, then there couldn't be any fiduciary duty breach by Sadigian and the other defendants by selling smoke curtains. And that was the basis for his decision. It was solely looking at the language of the distribution agreement and saying they did not have the capacity. And there's no evidence at all that at any time that OSS sought to amend that distribution agreement. So it did not have the capacity then and could not ever gain the capacity? It never sought to gain it and never had the capacity. Well, I mean, those are two different things. Yes, sir, and they didn't do either. And they didn't do either. And as evidenced by in the undisputed evidence presented during the summary judgment that there was an order log showing only fire curtains at this company was ordered from the BLE company. You have Millington's affidavit which says, no, we had a clear division between the services company which did smoke curtains and the Curtin company which did fire curtains. That's it. And whenever a smoke curtain opportunity came in, it went to services. Whenever a fire curtain opportunity came in, it went to Curtin. It was clear between the contracting parties. Sedighian, when he entered into the distribution agreement on behalf of Curtin in July of 2009, and BLE when it entered into that agreement, that's exactly what it meant. It was a clear division. And every other piece of documentation which we listed in our briefs and showed how these parties actually performed.  I'm sorry? He didn't do this in the first instance. He probably rused the day he did that. I think on that, we absolutely agree. Why? He already had the relationship with BLE. Why did he do that? And this was in the affidavit from Sedighian and the affidavit, I think, from BLE. BLE wanted to get into this off-the-shelf distribution of these fire curtain products. All of which is paroled evidence. That's right. They wanted to get into that. And Sedighian didn't want that. He did the smoke curtain business. He didn't want to do this off-the-shelf stuff. But essentially as a favor, okay, if you want to do this stuff, we'll create this company to do it. And Chris said he had some experience in setting up distributorships. Okay, you want to do this. The point is in smoke curtain. It can be. It can be. More so than in the fire curtain. Yeah. I mean, the way, unfortunately, this company got torpedoed before it really had a chance to take off. Which company? The curtain company on the fire curtain business. Fire curtain business. I'm sorry, gentlemen. That's fine. Thank you very much. You saved some time. You've got three minutes left. You probably used it all up here probably. Yeah, I think I might have. But we were asking you questions.  He's got some time here. Then we'll come back to you. Thank you, Your Honor. I'd like to focus for a second on what is the core defense here that's been raised, and that's this capacity idea, and the idea that the business opportunity doctrine is limited to contracts that a corporation already has in-house, it's already captured. We don't think that that's the full scope of the corporate opportunity doctrine. We would cite the Today Homes case where that wasn't the case, there was no existing contract, and the court still held that obtaining a contract with a third party was a usurpation of corporate opportunity. But if I could turn back to the questions Judge Wynn was asking, specifically about what was the record on disclosure here, and I would refer the court to page 777 of the joint appendix. That's where the defendants in their interrogatory answer said that they never disclosed the services distribution agreement to anyone other than BLE. Let me ask you about that first statement you made about capacity and that you don't need to show actual capacity in order to show usurpation of the opportunity. But doesn't the capacity ultimately go to the damages? If you never had the capacity, would never be able to engage in that business, then aren't we involved in an academic exercise here in terms of damages? If you can't show that you could have taken advantage of that capacity, then what does it matter? Well, we did. And below we had evidence in the record that Curtin was exploiting these opportunities, marketing these materials. It had a dealership network of 15 dealers that were used for purposes of marketing both fire and smoke curtains. But if you couldn't get the products from BLE, then what would it be? We respectfully disagree with the contention, which is bottomed on an affidavit from Mr. Millington, which is unauthenticated and parole and, therefore, doesn't trump, if you will, the actual distribution agreement. The actual distribution agreement between BLE and Curtin says that smoke curtains are among the products that it had an obligation to produce to plaintiff. In fact, it appointed Curtin as the exclusive distributor in the United States of smoke and fire curtains. You say BLE would be in breach of that distribution? Absolutely. But that gets back to the legal capacity argument. It isn't that Mr. Sudeian can't do this or Curtin can't engage in this business or sell these products. It is that they claim by themselves, even though they lack standing, they claim that the Curtin distribution agreement that signed by Mr. Sudeian doesn't permit or somehow actually excludes smoke curtains. There's no language of exclusion in there for smoke curtains. The title is a distribution contract relating to smoke and fire curtains. Products were identified in there as smoke curtains. Do you admit that there's at least a genuine issue of fact to be tried as to the proper scope of these agreements? Well, we would actually argue, and we did below, that we're entitled to summary judgment. But in this court, I think our position has to be that this is not an issue that's right for summary judgment, that it's a jury trial issue. But going back to their capacity argument, if they say you have to have an existing contract, we've got three sets of contracts here. We've got the operating agreement, which clearly defines smoke curtains as within the business purpose of U.S. smoke and fire curtain. We have the distribution agreement, which does likewise. And third, we have a set of dealership agreements, which identify, which state on their face that Curtin is involved, is engaged in the business of selling smoke and fire curtains. Now, the operating agreement was CYSA and OSS? That's correct. Who signed it on behalf of CYSA? Mr. Sedahan. Who signed OSS on behalf of that? Mr. Christ on behalf of OSS. And so these three sets of contracts are more than sufficient. Even if the legal issue was narrowed below the level that the Virginia Supreme Court held in today's homes, and they are right, that a company cannot protect its own contract, cannot protect its business opportunities from its own officers unless the company beats their officer to the contract. Even if that is the actual standard, which we submit isn't, it's satisfied here because we have three contracts, actually two contracts and a series of contracts with 15 dealers, which say unequivocally that Smoke Curtains is part of the business of U.S. Smoke and Fire Curtain. Thank you. Thank you, sir. Mr. Lucini. If I could just address two issues, Your Honor, quickly. Mr. Reed just referred to the Curtin distribution agreement and its title as authority for essentially them being in port Smoke and Fire Curtains. Paragraph 1.1.4, this is Joint Appendix 215, says the headings, content list, and front sheet are reference only and shall be ignored in its construction. That has no relevance. Second, he talked about the various dealer agreements. The typical dealer agreement. So we should strictly construe that paragraph, that title that you just gave us, but ignore the merger clause in it? Well, I would say that language is pretty clear. You don't consider the title in terms of time. Merger clause. I'm sorry? Merger clause language is pretty clear, too. You did a pretty good job on that. I'm not sure whether to thank you for that or not. With regard to the dealer agreement, with regard to the dealer agreement, we've referenced in our briefs there is a typical agreement that OSS refers to. As a matter of fact, this typical agreement was there into March of 2010, almost a year later. And that typical agreement says here's the products, using the cat word products, that we will be, you will be able to import and sell, dealer, versus Schedule A and Schedule B. Schedule A is only Fire Curtain products. There's nothing in Schedule B. And this is the typical agreement they talk about with the dealers. We also had affidavits from 10 of the 16 dealers saying we understood, it's only Fire Curtains. That's all our business was, 10 of the 16 dealers. We had one of the dealers who attended the presentation that was done on October 27 and 28. Remember this operating agreement was entered into the day, I think it was October 28. But in the presentation that they gave to all these prospective dealers, there is a, and this is in the joint appendix, there is a PowerPoint presentation, 16 some odd pages long. And we have highlighted all the comments that were made during that meeting of the division between the SISA company and what it does, that is smoke curtains. And what the dealers and the curtain company do, does, which is fire curtains. Everyone that attended that PowerPoint presentation, which included Mr. Chris, Mr. Sedigian, two representatives of BLE, and a host of dealers, everyone at that presentation has testified and given an affidavit that this is what we heard, this is what was told us, this is what the deal was. And then in terms of the way the distribution agreement was put into effect by the two parties, that is BLE and the curtain company, for the next two years, that's exactly what was put into effect. And how a parties, how the parties interpret and enforce their agreement, since it's a sales agreement, is given great weight. And here are those two parties, that is the curtain company and BLE, said it's fire curtains. That's what we sell through the curtain company. That's what our agreement says. That's what our agreement means. Thank you very much, sir. Thank you, sir. We appreciate counsel's arguments and thank you very much. We're going to come down and greet counsel and then take a short break.
judges: Robert B. King, James A. Wynn, Jr., Albert Diaz